AVAILABLE AT THE PUBLIC TERMINAL FOR VIEWING ONLY

U. S. Bankruptcy Court
MIDDLE DISTRICT OF TENNESSEE (Nashville)
Bankruptcy Petition #: 3:16-bk-03304

**Debtor:**

Charles E. Walker
69 Thompson Lane
Nashville, TN 37211

PARTIAL TRANSCRIPT OF PROCEEDINGS
Before The Honorable Randal Mashburn, Bankruptcy Judge
July 12, 2016

APPEARANCES

Counsel for the Debtor:

> THOMAS HAROLD STRAWN, ESQ.
> THOMAS HAROLD STRAWN, JR., ESQ.
> 731-285-3375
>
> CHARLES EDWARD WALKER, ESQ.
> 615-367-5111

Trustee:     JOHN C. MCLEMORE, ESQ.
             615-383-9495

             PHILLIP G. YOUNG, ESQ.
             615-465-6008

U. S. Trustee:   BETH ROBERTS DERRICK, Assistant US Trustee
                 615-736-2260

---

*ANN WOOFTER, Certified Court Reporter*
*2220 Golden Oak Place*
*Madison, Tennessee 37115*

*615-868-8800*

```
 1                           INDEX

 2   WITNESS                    DIRECT  CROSS  REDIRECT

 3   Judith Weaver                 3     13
 4                                       19
 5
 6   Rhonda Norman                23     33      37
 7                                       35
 8
 9
10
11
12   Ruling                    Page 38
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
```

```
 1                    (Witness sworn)

 2   THEREUPON came

 3              J U D I T H   W E A V E R

 4   who, having been first duly sworn according to law, testified

 5   as follows:

 6                    **DIRECT EXAMINATION**

 7   BY MR. BULSO:

 8         Q    State your name, please.

 9         A    Judith K. Weaver.

10         Q    Ms. Weaver, where do you live?

11         A    I live in the Atlanta Metro area.

12         Q    How long have you been in the Atlanta

13   Metro area?

14         A    Since 1983.

15         Q    What kind of work do you do there in the

16   Atlanta Metro area?

17         A    Currently I work for a real estate

18   investor that also teaches real estate to people that want to

19   get involved in investing in real estate.

20         Q    And what is that gentleman's name?

21         A    Louis Brown.

22         Q    How long is it, Mrs. Weaver, that you

23   have worked with Mr. Brown in Atlanta?

24         A    Since January of 2005.

25         Q    So, for the last 11 and a half years?
```

Case 3:16-bk-03304   Doc 324   Filed 10/19/16   Entered 10/19/16 08:46:57   Desc Main
                    Document      Page 3 of 50

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | Are you also a Notary Public in the State |

3  of Georgia?

4　　　　　　A　Yes, I am.

5　　　　　　Q　When is it that you became commissioned

6  as a Notary Public in the State of Georgia?

7　　　　　　A　The second time was sometime in 2005, at

8  Mr. Brown's request.

9　　　　　　Q　And why is it that Mr. Brown requested

10  that you become recertified as a Notary Public?

11　　　　　　A　Because he buys and sells properties.  He

12  needed someone to notarize his signature and signature of the

13  trustees on the properties that he purchases.  He purchases

14  them in a land trust with a trustee.

15　　　　　　Q　And are you currently a Notary Public in

16  Georgia?

17　　　　　　A　Yes.

18　　　　　　Q　In any particular county?

19　　　　　　A　DeKalb County.

20　　　　　　Q　DeKalb County is just next to Fulton

21  County?

22　　　　　　A　That's correct.

23　　　　　　Q　Did you bring with you your seal and your

24  stamp today?

25　　　　　　A　Yes, I did.

1            Q    If you would, Ms. Weaver, I'd like to

    2    show you what is marked for identification as Exhibit 6,

    3    excuse me, Exhibit 108, Part 1, Page 22.  Do you see, Ms.

    4    Weaver, that this appears to be a quitclaim deed?

    5            A    Yes.

    6            Q    And you'll note that it purports to be

    7    between L. V. Brown, as Trustee of Hamilton-Cleveland Trust,

    8    and Nationwide Investments, LLC.

    9            A    I see that.

    10           Q    And then if we look at the second page of

    11   Exhibit 108, Part 1, now Page 23, do you see that there

    12   appears what purports to be your signature and Notary Seal?

    13           A    I see that.

    14           Q    Did you, in fact, sign this quitclaim

    15   deed as a Notary Public?

    16           A    No, I did not.

    17           Q    Did you, in fact, affix your embossed

    18   Notary Seal to this quitclaim deed?

    19           A    No, I did not.

    20           Q    Did you authorize anyone to sign your

    21   name to this quitclaim deed?

    22           A    No, I did not.

    23           Q    Did you authorize anyone to affix your

    24   Notary Seal, your embossed Notary Seal, to this document?

    25           A    No.

```
 1                Q     Were your signature and seal, Mrs.
 2   Weaver, affixed to this quitclaim deed without your knowledge
 3   or consent?
 4                A     That is correct.  It was without my
 5   knowledge and without my consent.
 6                      MR. BULSO:  I move this document into
 7   evidence at this time.
 8                      THE COURT:  Any objection?
 9                      MR. MURPHY:  No objection.
10                      THE COURT:  All right, it's admitted.
11   That's Exhibit No.?
12                      MR. BULSO:  Exhibit 108, Part 1, Pages 22
13   and 23.
14                      (Exhibit 108 admitted)
15                      THE COURT:  Exhibits now are pre-filed,
16   what number is it?
17                      MR. KROG:  Your Honor, the Exhibit No. is
18   108.  It says Part 1 because we had to break a larger
19   document into two parts but the number of the exhibit is No.
20   108.
21                      THE COURT:  I have some confusion in what
22   I've got up here.  I'm showing 108 as being some supplemental
23   responses or something.
24                      MR. BULSO:  Yes, Your Honor, it is.  This
25   is part of that.
```

Case 3:16-bk-03304   Doc 324   Filed 10/19/16   Entered 10/19/16 08:46:57   Desc Main
Document     Page 6 of 50

1                    THE COURT:  All right.  That's fine.  But

         2      just for clarification, I'm trying to open up that document.

         3      Is it the entire No. 108 or is it this page?

         4                    MR. BULSO:  I moved into evidence

         5      yesterday these two pages, Your Honor.  If it would be more

         6      convenient, I'd be happy to move the entire exhibit in.

         7                    THE COURT:  It makes no real difference

         8      but what will be a part of the record is the document that's

         9      filed as 108.  If you want to admit, for evidentiary

        10      purposes, certain pages from that, we can indicate that on

        11      the record.  But the entire document would be a part of the

        12      formal record.

        13                    MR. BULSO:  In that case, I think it

        14      would be more convenient to introduce, move into evidence,

        15      all of Exhibit 108, Your Honor.  They are sworn responses

        16      from the Defendant.

        17                    THE COURT:  Is there any objection to

        18      that?

        19                    MR. MURPHY:  (Inaudible - not at

        20      microphone)

        21                    THE COURT:  I'm sorry, I think the mics

        22      may be turned off at the table there.

        23                    MR. MURPHY:  I'm sorry; is that better?

        24                    THE COURT:  Yes.

        25                    MR. MURPHY:  Your Honor, we have

                                                                      7

1    no problems with the two pages that have just been
2    authenticated being admitted into evidence.  While sitting
3    here we haven't had time to review the remaining balance of
4    that exhibit and so we –

5              THE COURT:  Let me clarify this, not just
6    for this purpose but for other purposes, when something is
7    pre-filed and we admit it, it literally is a matter of
8    checking the box and then ultimately clicking a button and
9    that all goes into the record.  If there's no objection to
10   those two pages then we can simply clarify that in the record
11   and I won't rely upon anything else and it won't be proper
12   evidence if there were an appeal or anything.  But it would
13   still be in the record in terms of anyone seeing it.

14             Most of the time that doesn't matter.
15   Occasionally we have situations where there are Social
16   Security Numbers or things that you don't want to be in any
17   appellate record, even if no one is taking it into account
18   for any evidentiary purposes.

19             So, for our purposes, the easiest thing
20   is to go with what is in the pre-filed exhibit.  Even if
21   there is some dispute about the admissibility of some portion
22   of it we can simply say this portion of it is admissible and
23   the other is disputed as to admissibility, but it still all
24   gets in the record.

25             So, with that in mind, I want to be

8

1  sure there's no dispute not only on this one but I suspect

2  this may come up over and over.  So, I guess, Mr. Murphy, my

3  question is, are you okay with the document being in the

4  record but the Court's admissibility of it, the ruling would

5  be limited to those two pages.

6                    MR. MURPHY:  Absolutely, Your Honor.

7                    THE COURT:  Then in that case we're

8  talking about Pages 22 and 23 of that document?

9                    MR. MURPHY:  Yes, Your Honor.

10                    THE COURT:  No. 108.  All right.  Sorry

11  for that but maybe that will save us some time along the way.

12  Let's make that distinction whenever we can.

13                    The other option, just so we're clear, is

14  at a break or something we could always have you upload the

15  particular pages of a document if there's some situation

16  arises where we need less than the whole thing.  All right?

17                    MR. BULSO:  Thank you, Your Honor.

18  BY MR. BULSO:

19                    Q    As you look at Exhibit 108, Mrs. Weaver,

20  is there anything that jumps out at you as being different

21  from the manner in which you ordinarily sign and seal

22  documents as a Notary Public?

23                    A    Yes, there are several things.  I

24  normally have an embosser and then I have a separate stamp.

25  I do not ever type in when my commission expires.  I always

9

1    use a stamp.  The stamp is a black stamp.  And then as soon

2    as I stamp it and have embossed it, I take my finger – I have

3    an old-fashioned ink pad and I just touch the ink pad and

4    then I go over the embosser so that it shows when I scan it

5    or want to make a copy.  But it's all in black ink because my

6    ink pad is only black ink.  So, it would never have been in

7    blue.  And, again, I never type in the expiration date of my

8    commission; I would have had a stamp which stated that.

9              Q    Now, if we look at the first page of the

10   document, Mrs. Weaver, is it customary in your office for

11   quitclaim deeds to be used to transfer property?

12             A    I wouldn't say it's common.  I've used

13   them.  Mr. Brown sells real estate forms and I would have

14   used the form that he has in his books and on his CD's, which

15   is slightly different wording from this.

16             Q    So, this is not a form that appears in

17   Exhibit 108 that you use in your office to transfer real

18   property by a quitclaim deed?

19             A    That is correct.  It is not the form I

20   would use and I did not type this.

21             Q    One thing that I'm sure you also noticed

22   on the second page of this exhibit is that it also purports

23   to contain a signature for Mr. Brown.  Did you see that?

24             A    Yes.

25             Q    Do you have any reason to believe

1 that Mr. Brown actually signed this document?

2    A He stated to me personally he did not

3 sign the —

4    MR. MURPHY:  Objection, hearsay.

5    THE COURT:  Response?

6    MR. BULSO:  Let me reframe the question,

7 Your Honor.

8    THE COURT:  All right, I'm going to

9 sustain the objection then.

10 BY MR. BULSO:

11    Q You'll note that this document contains

12 what purports to be Mr. Brown's signature, Mrs. Weaver?

13    A Yes.

14    Q And if we look at the first page you'll

15 note that this document purports to involve a transfer of

16 property from Mr. Brown to what he called Nationwide

17 Investments LLC.

18    A Yes.

19    Q And when we look at what has been marked

20 as Exhibit 60, do you see that there is a stamp on Exhibit

21 60, Mrs. Weaver, that indicates that there was a value of

22 $1000 associated with this quitclaim deed?

23    A I see that.

24    Q And when we look at the second page of

25 Exhibit 60, do you see once again that there's a

1  representation of your signature and seal, this one in black

2  and white?

3          A    Yes.

4          Q    Is it accurate to say that this also is

5  not your signature or your seal?

6          A    It looks like my signature. I did not

7  put it on that document because, again, if I would have done

8  that there would have also been my stamp with the embosser.

9  I always use both of them.

10         Q    So you did not sign or seal Exhibit 60;

11 is that correct?

12         A    That is correct, I did not.

13         Q    And you'll note that there is, on Exhibit

14 60, this Affidavit of Consideration that recites the actual

15 consideration of the value of the property was $1000.

16         A    I see that.

17         Q    To your knowledge, did Mr. Brown or

18 anyone in your office receive $1000 as consideration for the

19 transfer of the property that's listed in this quitclaim

20 deed?

21         A    To my knowledge, no one received it. I

22 would have been the only one that would have been given to so

23 I could have put it in my records. Normally, I make a copy

24 and I scan in any income or remuneration that Mr. Brown

25 receives and then I give it to the bookkeeper. I have

1   no record of ever receiving any $1000 from these folks.

2              Q    And did you, in fact, look to determine

3   whether or not there was any record in your office of this

4   transaction?

5              A    I did.  I actually looked at the paper

6   record and I scanned my whole computer.

7              MR. BULSO:  Your Honor, we'd move Exhibit

8   60 into evidence at this time.

9              THE COURT:  Any objection.

10             MR. MURPHY:  No objection, Your Honor.

11             THE COURT:  All right, it's admitted.

12             (Exhibit 60 admitted)

13             MR. BULSO:  Thank you, Mrs. Weaver.  We

14  have no further questions.

15             THE COURT:  Cross-examination.

16                   **CROSS-EXAMINATION**

17  BY MR. MURPHY:

18             Q    Good Morning, Mrs. Weaver; my name is

19  Matt Murphy.  I just have a few questions for you.  When you

20  were testifying you had explained to the Court about your

21  embosser and stamp.  Could you just explain the embosser to

22  me?  I'm not quite sure that I understand, without having

23  some information from you, what that entails?

24             A    I have it with me.  I'd be happy to get

25  it out and show you.

1    Q    Sure.

2    A    It looks like this (indicating), you open

3    it up and you put the paper in the embosser, squeeze the

4    embosser, and it actually makes indentations in the paper,

5    indicating that I notarized that document.

6              MR. MURPHY:  I'm sorry, can we pull that

7    exhibit back up, please?

8              THE COURT:  Whenever this occurs, just so

9    we're clear, the Courtroom Deputy is capable of finding

10   something, but to the extent the parties can cooperate, it's

11   always more efficient.  So, I appreciate that.

12   BY MR. MURPHY:

13             Q    The embosser that you held up, is that

14   what creates the lines and the circle on your seal?

15             A    That is correct.

16             Q    And so I guess my question is, how can

17   you tell from this copy that the embosser was not used?

18             A    Pardon me?

19             Q    How can you tell from this exhibit that

20   the embosser was not used when this was notarized?

21             A    The embosser that I used when I - after I

22   actually made the embossing, I have a stamp that I use, which

23   is black.  And I take my finger and I go over the embosser.

24   This shows a blue ink on that embosser.  I've never, ever,

25   ever had a blue ink pad.  The only color it ever could

1  have been would have been black.

2                MR. MURPHY:  Madam Clerk, if you could

3  pull up Exhibit 60, I believe it was, that was also pulled

4  up.  I believe that was the last exhibit that was used by the

5  moveants.  I apologize, Your Honor.  If it would be easier

6  for me to just bring my computer up, I can flip back and

7  forth between the two.  I hadn't really anticipated – great.

8  Thank you.

9  BY MR. MURPHY:

10              Q    If you could scroll down to the notary

11 seal on this exhibit.  Mrs. Weaver, on this copy the seal is

12 black; is that correct?

13              A    It's a copy so it would have been black

14 just because when you copy something it only has black ink.

15              Q    Sure.  And that leads to my next

16 question.  How was the document that you reviewed presented

17 to you?  Was it an original document?

18              A    The document that I looked at to

19 determine if it was mine?

20              Q    Correct.

21              A    The document I looked at was a copy.  It

22 did have the embosser; however, it did not have my stamp,

23 which I always use with the embosser.  I use both of them

24 together.

25              Q    So the stamp is missing from both

1    of these exhibits.  What we see is the embosser but not the

2    stamp?

3                A    That is correct.

4                Q    Again, my question is how was the

5    document for review presented to you?  It was a copy you

6    said?

7                A    How was the document presented to me?  In

8    what context?

9                Q    When you were asked to review, to say did

10   I notarize this document, and you looked at that, was that a

11   copy that was presented to you?

12               A    Yes.

13               Q    So, it wasn't blue as the exhibit that

14   was first pulled up here showed?

15               A    No, it looked just like this, I think.

16   And I first noticed that I did not have – my stamp was not on

17   it, which clearly has my expiration date on that stamp.  I

18   have a copy of my stamp here.

19               Q    Mrs. Weaver, how did you learn about the

20   quitclaim deed in question?

21               A    If I remember correctly, Mr. Carl Ditto

22   (phonetic), who is an investor in Chattanooga, called me.

23   Mr. Brown had had some dealings with Mr. Ditto and when he

24   saw the document he called and asked me if I was aware of it.

25               Q    And who else have you talked to since

1   the original contact with Mr. Ditto regarding this quitclaim

2   deed?

3         A    Another person that I've talked to about

4   it? Other than the attorney, no one else.

5         Q    Mrs. Weaver, you had signed an affidavit,

6   or a declaration, I'm sorry, prior to testifying here today;

7   is that correct?

8         A    Yes.

9         Q    Did you prepare that declaration?

10        A    I honestly don't remember.

11        Q    So, you wouldn't recall, then, if you

12   revised the declaration if it was presented to you before

13   signature?

14        A    I'm sorry?

15        Q    You wouldn't recall, then, if you made

16   any changes to that declaration before it was signed?

17        A    I'm sorry, it's been a long time ago. I

18   did read it and I agreed with it and that's why I signed it.

19   I will tell you that.

20        Q    And in both of the exhibits that have

21   been shown to you, they both have been prepared by J. D.

22   Brown, but you've testified that you don't believe that's

23   accurate?

24        A    No, it says it was prepared by L. D.

25   Brown's trustee.

| | | |
|---|---|---|
| 1 | Q | I'm sorry. L. D., thank you. |

1      Q    I'm sorry.  L. D., thank you.

2      A    I work for Mr. Brown.  I'm the only one
3 that prepares any legal documents for him.  I did not prepare
4 this.

5      Q    Mrs. Weaver, do you know who would have
6 affixed your notary seal to that document?

7      A    I have no idea.

8           MR. MURPHY:  Thank you.  I have no
9 further questions.

10          THE COURT:  Any Redirect?

11          MR. BULSO:  None, Your Honor.

12          THE COURT:  All right, any reason Mrs.
13 Weaver can't leave if she'd like to?

14          MR. BULSO:  She may be excused with our
15 thanks, Your Honor.

16          THE COURT:  You can be excused.  You're
17 welcome to stay or you're welcome to go.

18          MRS. WEAVER:  It's a long drive home.

19          THE COURT:  All right, next witness.

20          MR. BULSO:  Your Honor, the Moveants call
21 Rhonda Norman as the next witness.

22          THE COURT:  All right.

23          MR. STRAWN:  Your Honor, Tom Strawn for
24 REO Holdings.  I'd like to get some clarification from the
25 Court on something.  I realize we're having a consolidated

1 hearing but does the Court just want one of the lawyers

2 representing the two bankrupt estates to have access to

3 cross-examination?

4         THE COURT: No, I'm sorry. That was my

5 mistake. I was assuming not anything further but did you

6 want to cross-examine Mrs. Weaver?

7         MR. STRAWN: Your Honor, I did have a

8 couple of questions I wanted to ask her.

9         THE COURT: All right, see if we can

10 catch Mrs. Weaver. I would prefer that the parties

11 coordinate their efforts so that we don't have any

12 duplication but I'm not going to prohibit REO from separately

13 -

14         Mrs. Weaver, apparently we overlooked the

15 fact that a separate attorney for REO, which is a separate

16 party in this, might have a question or two. Sorry for the

17 inconvenience.

18 THEREUPON came

19         J U D I T H   W E A V E R

20 Who, having been previously sworn, resumed the witness stand

21 and further testified as follows:

22         **CROSS-EXAMINATION**

23 BY MR. STRAWN:

24         Q    Mrs. Weaver, my name is Tom Strawn and I

25 represent REO Holdings. Mrs. Weaver, can you tell me, do you

```
 1   keep that embossing implement in your possession all the

 2   time?

 3              A     I do.  And usually I keep it in my car.

 4              Q     So, when you're not at the office it

 5   would be in your car?

 6              A     Yes.

 7              Q     Do you have any explanation why it would

 8   appear on this document?

 9              A     It had to have been copied or lifted from

10   another document that I would have notarized.

11              Q     Would that create the ability to rub an

12   ink pad on it and it turn out blue?  Do you understand what

13   I'm saying there?  With an imprint if it had been lifted from

14   another document.

15              A     If it had been lifted from another

16   document that was either the original - if it was lifted from

17   an original document, my name would have been signed in blue,

18   the embosser would have been in black.  If it had been lifted

19   from a copy they would both be in black.  However, the only

20   way you could get that in the embosser in blue would be with

21   Photoshop or some other software program that you could

22   easily do that with.

23              Q     To your knowledge, from your involvement

24   in the real estate market, is there a requirement in

25   Register's Offices that signatures be in blue?
```

```
 1              A    I have no idea.  I will tell you that I

 2    have done research with robo signing, so I'm very careful to

 3    make sure that my signature is clearly done in the same way

 4    each time.  That's why I sign in blue, I use the embosser so

 5    that you can clearly see the original, you can feel the

 6    original.  I deliberately darken it so that when I scan it in

 7    and when I copy it I can make sure that the embosser is

 8    there.  And then I stamp it with my expiration date.  That

 9    way, for me, it is very clear that I personally have done

10    this.

11              Q    Do you recall about when you were

12    contacted by Mr. Ditto?

13              A    It would have been sometime last year,

14    mid-year.

15              Q    About mid-year last year?

16              A    Yes.

17              Q    And did Mr. Ditto tell you what interest

18    he had in contacting you?

19              A    What interest he had in contacting me?

20    I'm not real sure what you mean.

21              Q    Why do you think Mr. Ditto contacted you

22    to inform you about this?

23              A    He told me he was at the courthouse with

24    another investor and Mr. Ditto does (inaudible) sales, and he

25    saw this document and he was curious about it so he called
```

1  me.  We had been talking previously, about two months

2  earlier, so I was on his mind when he saw that.

3          Q     So he indicated to you he was just

4  curious about it?

5          A     Yes.

6                MR. STRAWN:  Okay.  Thank you.

7  No further questions, Your Honor.

8                THE COURT:  Any Redirect?

9                MR. BULSO:  None, Your Honor.

10               THE COURT:  I hope this time it's for

11 real, Mrs. Weaver.

12               MR. STRAWN:  Your Honor, we will try to

13 keep it to just one of us from now on.

14               THE COURT:  Well, I'm not restricting

15 you.  I just, in the interest of time, I hope, at least on

16 most matters, that you can try to coordinate.  But there are

17 separate cases, separate parties, and so I'm not going to

18 restrict you in that regard.

19               MR. STRAWN:  Thank you.

20               THE COURT:  All right, next witness.

21               MR. BULSO:  The Moveants call Ms. Wanda

22 Norman as the next witness, Your Honor.

23               THE COURT:  All right, somebody can tell

24 Ms. Norman that she's up.

25                      (Witness sworn)

```
 1                    CLERK:  State your full name for the

 2    record.

 3                    THE WITNESS:  Wanda Norman.

 4    THEREUPON came

 5              W A N D A   N O R M A N

 6    Who, having been first duly sworn according to law, testified

 7    as follows:
```

**DIRECT EXAMINATION**

```
 9    BY MR. BULSO:

10              Q    Good afternoon, Ms. Norman.  Ms. Norman,

11    where is it that you live?

12              A    I live in Greenbrier, Tennessee.

13              Q    How long have you lived in Greenbrier,

14    Tennessee?

15              A    Twenty years or more.

16              Q    Do you plan on staying there?

17              A    Yes.

18              Q    Greenbrier is in Robertson County,

19    Tennessee.

20              A    Yes.

21              Q    Where is it, Ms. Norman, that you work?

22              A    I work for Ghertner and Company.

23              Q    How long have you been with Ghertner &

24    Company?

25              A    It will be eight years Friday.
```

```
 1                    Q    And what is it that you do at Ghertner &
 2   Company?
 3                    A    I'm an Accounting Assistant in the
 4   Accounting Department.
 5                    Q    What type of a company is Ghertner &
 6   Company?
 7                    A    It's property management.
 8                    Q    What type of property does Ghertner &
 9   Company manage, Ms. Norman?
10                    A    Homeowner Associations, condo
11   associations.
12                    Q    Now, are you also currently a Notary in
13   the State of Tennessee?
14                    A    Yes, sir.
15                    Q    And how long has that been the case?
16                    A    Four years, I believe.
17                    Q    Why is it that you became a Notary in
18   Tennessee four years ago?
19                    A    My company, when an account becomes
20   delinquent, will turn the account over to an attorney who
21   will place a lien on the property and I become a Notary to
22   notarize the lien and release it, and sworn accounts for
23   court and for our attorneys.
24                    Q    So, during the last four years you've
25   used your Notary Seal to notarize documents in
```

24

1    connection with your employer's business?

2              A    Yes, sir.

3              Q    Have you used it in any other manner?

4              A    I've used it to notarize baseball, like

5    birth certificates for a baseball team, with permission from

6    my office, and that's it.

7              MR. BULSO:  If you could, let's take a

8    look at Exhibit 58.  If we could put the projector on the

9    podium, please.

10   BY MR. BULSO:

11            Q    Do you see what's been marked for

12   identification, Ms. Norman, as Exhibit 58?

13            A    Yes.

14            Q    And do you see that the title of the

15   document reads "Assignment of Lien"?

16            A    Yes.

17            Q    Do you see that it purports to have been

18   signed by Mr. Steve A. Long?

19            A    Yes.

20            Q    And do you also see that it purports to

21   have your signature and Notary Acknowledgement at the very

22   bottom of the first page?

23            A    Correct.

24            Q    Did you sign this Assignment of Lien

25   that's been marked as Exhibit 58, Ms. Norman?

```
 1          A     No, sir.

 2          Q     Did you seal this Assignment of Lien with

 3   your Notary Seal?

 4          A     No, sir.

 5          Q     Did you authorize anyone to sign your

 6   name to this Assignment of Lien?

 7          A     No, sir.

 8          Q     Did you authorize anyone to affix your

 9   seal to this document?

10          A     No, sir.

11          Q     Were your signature and seal affixed to

12   this Assignment of Lien without your knowledge or consent?

13          A     Yes, sir.

14          Q     In the upper right-hand corner of the

15   document, Ms. Norman, you'll note that it purports to have

16   been prepared by Mr. Charles Walker, Attorney.

17          A     Yes.

18          Q     Do you know Mr. Walker?

19          A     No, sir.

20          Q     Have you ever met Mr. Walker?

21          A     No, sir.

22          Q     Have you ever spoken with Mr. Walker?

23          A     No, sir.

24          Q     Would you know Mr. Walker if you saw him?

25          A     No.
```

```
 1                    MR. BULSO:  Your Honor, I want to move

 2   Exhibit 58 into evidence.

 3                    THE COURT:  Any objection?

 4                    MR. MURPHY:  No, Your Honor.

 5                    THE COURT:  All right, it's admitted.

 6                    (Exhibit 58 admitted)

 7   BY MR. BULSO:

 8             Q    If I could now, Ms. Norman, let me ask

 9   you to take a look at what's been marked as Exhibit 108, Part

10   1, Page 13.  You'll note that this Assignment of Lien is

11   similar to the one that we just looked at, except that on

12   this document you signature appears on blue.  Do you see

13   that?

14             A    Yes.

15             Q    You'll also note that on this document

16   part of your seal appears in blue, also, correct?

17             A    Correct.

18             Q    And you'll also note that there's a date

19   that's handwritten in, a 16 that appears in blue.

20             A    Correct.

21             Q    Did you affix your signature to this

22   document?

23             A    No, sir.

24             Q    Did you affix your seal to this document?

25             A    No, sir.
```

Case 3:16-bk-03304   Doc 324   Filed 10/19/16   Entered 10/19/16 08:46:57   Desc Main
                    Document      Page 27 of 50

| | | |
|---|---|---|
| 1 | Q | Did you write 16 on this document? |
| 2 | A | No, sir. |
| 3 | Q | Did you authorize anyone to do any of |

4  those things?

5  A  No, sir.

6  Q  Were all of those things done without

7  your knowledge or consent?

8  A  Yes, sir.

9  Q  Is there anything in particular about

10  this document, Ms. Norman, that stands out as obvious to you

11  that you didn't do it?

12  A  The 16, first of all, that's not my

13  handwriting.  And second of all, all of the liens that I

14  sign, when I date them, I would have put a "th".  Instead of

15  just 16, I would have put 16th day of December.

16  MR. BULSO:  Your Honor, we'll move

17  Exhibit 108, Part 1, Page 13 into evidence at this time.

18  THE COURT:  Any objection?

19  MR. MURPHY:  No, Your Honor.

20  THE COURT:  All right, it's admitted.

21  (Exhibit 108 admitted)

22  BY MR. BULSO:

23  Q  You recall, Ms. Norman, that earlier you

24  provided a declaration that was used in this case when it was

25  in state court?

```
1          A     Yes.

2          Q     Did you receive a call yesterday from an

3   attorney for REO Holdings named Sheila Stevenson?

4          A     Yes, I did.

5          Q     And did Ms. Sheila Stevenson ask you

6   questions about that declaration?

7          A     Yes.

8          Q     If you could, relate to the Court what

9   she asked you and what you told her.

10               MR. MURPHY:  Objection, hearsay.

11               THE COURT:  Response?

12               MR. BULSO:  It's clearly a party

13  admission, Your Honor, under Rule 803 - excuse me, under 801-

14  2-2(d) in the Federal Rules.  A statement by an attorney

15  counts as a statement of a party and, therefore, it's an

16  admission.  It's not hearsay.

17               THE COURT:  What's your reply to that?

18               MR. MURPHY:  If the Court please, Ms.

19  Stevenson is not an attorney, I don't think, before this

20  Court at this point.

21               THE COURT:  She's appeared.

22               MR. MURPHY:  Yes, sir, she has.  And she

23  has filed a Notice of Withdrawal but this is the first I've

24  heard about it and I know of no reason why she should be -

25  whatever she said should be brought in before the Court.  I
```

29

1  believe it's hearsay.  We could have her appear if the Court

2  would wish it.

3           THE COURT:  Are you telling me that she

4  does not represent REO?

5           MR. MURPHY:  In this Bankruptcy, Your

6  Honor, I believe she has represented REO in their business

7  dealings.

8           THE COURT:  Well, I'm confused.  She

9  filed documents in this court.  By local rule that means

10  she's made appearances in this Court.  And by rule, in this

11  Court you don't just file a Notice of Withdrawal, you have to

12  file a Motion to Withdraw as Counsel and get approved to

13  withdraw as Counsel.  So, as of this moment, she is an

14  attorney of record in this case.

15           MR. STRAWN:  All right, sir.  I will

16  advise Ms. Stevenson she needs to file a motion, Your Honor.

17           THE COURT:  Well, that's for another day.

18  My question is how does that fit into your objection?

19           MR. STRAWN:  Well, my objection was that

20  for the purposes of this hearing she was not an attorney in

21  this Bankruptcy Court.  And from what I'm understanding from

22  the Court, she is.  And if that's the case, I'll have to

23  withdraw my objection.

24           THE COURT:  All right, I'm going to allow

25  the question, based on the fact that it appears on the face

1   of it that we're talking about a statement by an attorney who

2   has made an appearance in this case and who has not, as of

3   yet, withdrawn from that role.  So, we'll see where this goes

4   but I'll allow that question to be answered anyway.

5                  MR. STRAWN:  Thank you, Your Honor.

6   BY MR. MURPHY:

7          Q     Ms. Norman, what is it that Ms. Stevenson

8   asked you and how did you respond?

9          A     She asked me if I drew up the document or

10  if you all drew it up and sent it to me, and I stated to her

11  that you all drew it up, sent it to me, I signed it and sent

12  it back to you all.  She asked me if I was paid to sign the

13  document, which I absolutely was not paid to do so.  I stated

14  to her that I had no problem signing the document because I

15  did not in any way sign that lien.

16                 She asked me if I still had the original

17  and I told her I believed that I had given that to you all.

18  And I think that's about it concerning that particular

19  declaration.

20         Q     Is everything that was in the declaration

21  that you signed 100 percent accurate?

22         A     Yes, sir.

23         Q     Is everything that you've testified here

24  this afternoon before Judge Mashburn 100 percent accurate?

25         A     Yes, sir.

1          MR. BULSO:  No further questions,
2   Your Honor.
3          THE COURT:  All right, cross-examination
4   by either or both.  And Ms. Derrick, obviously, anytime you
5   want to ask any questions of any witness, you're more than
6   welcome to do so but unless you raise the issue I'll assume
7   that you don't.
8          MS. DERRICK:  There are one or two issues
9   that, if raised, I would probably seek some clarification but
10  I'm not sure if they will be raised in this proceeding.
11  Thank you.
12         THE COURT:  Just don't let us leave you
13  out.
14         MS. DERRICK:  No, Your Honor.  I am most
15  concerned with the burden of proof argument and the
16  memorandum that I had filed.  And you are in receipt of that?
17         THE COURT:  Yes.
18         MS. DERRICK:  Thank you.
19         MR. MURPHY:  I apologize, Your Honor.
20  I'm just trying to help speed up the process and I don't know
21  if that's happening.
22         THE COURT:  Are you having issues with
23  your computer or the connection?
24         MR. MURPHY:  No, it's with my computer.
25  I can't seem to get the exhibit over onto the view screen.

```
1   So, maybe what I would just do is ask the Clerk, if possible,

2   to pull up Exhibit 108, Page 13, that was previously before

3   the Court.

4                        CROSS-EXAMINATION

5   BY MR. MURPHY:

6            Q    Ms. Norman, my name is Matt Murphy.  I'd

7   just like to ask you a few questions to follow up from the

8   initial questions.  You had mentioned previously that you

9   knew that this wasn't notarized by you because of the

10  handwritten date; is that correct?

11           A    That is correct.

12           Q    Would you ever sign a document where the

13  date has already been provided on the document?

14           A    As I stated before, all of the liens that

15  I sign are for my company and I write all of those dates

16  myself.

17           Q    But you would not notarize a document

18  that has a date already prepared in there; is that what you –

19           A    And they're not typically given to me

20  with the date on there; no.  They are all specifically for my

21  company and they sign them and I date them and I notarize

22  them right there.

23           Q    Ms. Norman, is that your signature that

24  is on the document in question?

25           A    Yes.
```

```
 1                Q      And is that your seal?

 2                A      Yes.

 3                Q      How is it that you first learned about

 4     the discrepancies with this document?  Who contacted you

 5     about the assignment of lien?

 6                A      My boss contacted me.  I was actually out

 7     of town and she had been contacted by Mr. Krog, I believe.

 8                Q      Do you remember when that was?

 9                A      It was in July of 2014 – I can't

10     remember.

11                Q      You mean two years ago?

12                A      I believe so.  I have the emails at work

13     but I don't have them with me.

14                Q      Are you employed by anyone else other

15     than Ghertner Company?

16                A      I do administrative work for an attorney,

17     Frye Jenkins (Phonetic), who only does collections for

18     Ghertner & Company.

19                Q      I see.  So you wouldn't notarize any

20     documents through your employment there?

21                A      I do but they're sent to Ghertner &

22     Company and I notarize them there because that's the only

23     work he does is collections for Ghertner & Company.

24                Q      Previously you said you only notarize

25     liens that you provide to your attorney; is that exactly
```

                                                            34

```
 1    what those documents are as well?

 2              A    Yes.

 3              Q    Ms. Norman, did you know Kevin Watts?

 4              A    No.

 5              MR. MURPHY:  I have no further questions.

 6    Thank you.

 7              THE COURT:  All right, any other cross-

 8    examination?

 9              MR. STRAWN:  Just one question, Your

10    Honor.

11                    CROSS-EXAMINATION

12    BY MR. STRAWN:

13              Q    Ms. Norman, do you maintain a Notary Log?

14              A    No, sir.

15              Q    Do you know whether or not maintaining of

16    a Notary Log is recommended by the statute that authorizes

17    people to become notaries?

18              A    Yes.

19              Q    It is recommended.  Is there some reason

20    you don't maintain one?

21              A    My company manages 45,000 units.  If I

22    wrote down every single lien that I notarize for my company

23    that's all I would be doing.  But, like I said before, I only

24    notarize liens for companies that are managed by my company.

25    And this address was not managed by my company and
```

                                                          35

1   so, therefore, I know I did not sign this document.

2            Q    So, the reason you know that you didn't

3   sign the document is the address doesn't appear to be one

4   that was managed by your company?

5            A    I don't know anybody on the document; I

6   don't know the address; and like I said, that's not my

7   handwriting on this document.

8            Q    I thought you said that's your signature?

9            A    I said that's not my handwriting at the

10  date.  I said that is my signature but that's not my date

11  handwriting.

12           Q    Where it says 16?

13           A    Right.

14           Q    Because you would put "th" after it?

15           A    Correct.  And that's not what I would

16  write.  That's not how I write 16 either.  It's not my

17  handwriting.

18           Q    And my question is, is that what you're

19  basing the fact that you did not notarize that document on?

20           A    The fact that I've never notarized a lien

21  for anybody other than Ghertner & Company is what I'm basing

22  my – and the fact that I don't know this address, I don't

23  know this attorney.  I can tell you the attorneys who I have

24  notarized documents for and that is not one of them.

25                MR. STRAWN:  Okay, thank you.

```
1                    THE COURT:  Any Redirect?

2                    MR. BULSO:  Just one question, Your

3    Honor.

4                    REDIRECT EXAMINATION

5    BY MR. BULSO:

6            Q    Ms. Norman, you'll note that this

7    Assignment of Lien purports to assign and transfer this lien

8    to a company called REO Holdings, LLC, a Tennessee Limited

9    Liability Company.  Do you see that?

10           A    Yes.

11           Q    Have you ever heard of that company?

12           A    No, sir.

13           Q    Do you know anything about that company?

14           A    No, sir.

15                   MR. ***:  No further questions, Your

16   Honor.

17                   THE COURT:  Any further cross-

18   examination?

19                   MR. STRAWN:  No, Your Honor.

20                   THE COURT :  All right, Ms. Norman, you

21   can step down and you're free to go, if you'd like.

22                   THE WITNESS:  Thank you.

23                   THE COURT:  I assume there is no reason

24   that she needs to stay.

25                   MR. BULSO:  She may be excused with
```

Case 3:16-bk-03304   Doc 324   Filed 10/19/16   Entered 10/19/16 08:46:57   Desc Main
                    Document      Page 37 of 50

1   our thanks, Your Honor.

2                    THE COURT:  All right, next witness.

3                    (End of testimony of Ms. Norman and

4                    Ms. Weaver)

5                    CLERK:  All rise.

6                    THE COURT:  Be seated, please.

7                         **RULING**

8                    All right, this matter is before the

9    Court on motions to appoint a trustee in two cases, Charles

10   Walker, Case No. 16-33-04 and REO Holdings, LLC, Case No. 16-

11   33-49.

12                   We consolidated the two cases for hearing

13   for the limited purpose of the motions to appoint trustee.

14   So, we've heard evidence today that relates to both cases and

15   there's been no distinction between those two in terms of

16   what is pertinent to one case versus the other.  So,

17   everything I'm going to say relates to the two cases,

18   jointly.

19                   The evidence really boils down to some

20   specific transactions and a few other events that serve as

21   the basis for the Moveants to assert that Mr. Walker and his

22   company, which is 50 percent owner and has been the primary

23   person involved in running it, apparently, REO, that these

24   incidents reflect some type of improper conduct that

25   would give rise to the appointment of a trustee.

1          Now, the statute that governs is 11-USC-
2     1104 that provides that the Court, after notice in a hearing,
3     can appoint a trustee.  And the grounds are, basically, two
4     types.  One is for cause, including fraud, dishonesty,
5     incompetence, or gross mismanagement of the affairs of the
6     Debtor.  It goes on and is detailed but, basically, those are
7     the key words: cause, including fraud, dishonesty,
8     incompetence, or gross mismanagement.  And the second is, if
9     such appointment is in the interest of creditors and other
10    parties affected.  It's an either/or type of standard that
11    applies.

12          In considering those two grounds, for
13    cause or interest of creditors, the Court has reviewed the
14    evidence that has been presented, and a brief review of that
15    evidence is probably worthwhile.  I don't want to go into too
16    much detail but I think it's worth mentioning some of the key
17    elements.

18          First was the testimony of Judith Weaver,
19    which primarily related to portions of Exhibit 108 and
20    Exhibit 60.  And the bottom line is that Ms. Weaver is a
21    Notary in Georgia who is quite adamant that she did not sign
22    the pertinent document that involved a quitclaim deed for the
23    ultimate benefit of REO and Mr. Walker.

24          The details get a little deep in terms
25    of how notaries work but it, basically, boils down to

1    the fact that she has certain procedures involving the
2    embossing tool and a stamp and the way she signs her name and
3    the type of ink she uses, and other factors that make it easy
4    for her to tell when a document is not one that she signed or
5    sealed.  And the Court was quite convinced that this
6    particular document, Exhibit 60, is one that she did not sign
7    or seal and, therefore, in some manner or another REO and Mr.
8    Walker ended up being the beneficiary of a document that was
9    clearly forged by someone.

10            The situation is somewhat similar with
11   regard to a Tennessee Notary who testified, Rhonda Norman.
12   The circumstances there are not quite as detailed but the
13   upshot is the same, that she is absolutely convinced and the
14   Court is likewise convinced that Exhibit 58, which is also a
15   part of Exhibit 108, was a document that did, in fact,
16   include some type of forgery.

17            It's a little unclear, with regard to
18   either of those documents that ultimately were for the
19   benefit of Mr. Walker's company and REO, how the forgery took
20   place.  But the only logical conclusion from the testimony
21   was that it would have involved some type of copying from
22   other legitimate signatures on other documents, whether it
23   was done by some type of cutting and pasting, whether it was
24   some kind of photo shopping or exactly what was done.
25            The third one that is fairly

1  significant is the quitclaim deed involving Cara Woods. That
2  particular document, which is Exhibit 13, and you'll have to
3  look at Exhibit 95 and Exhibit 51 to see the full picture,
4  but the bottom line is that it's clear from that combination
5  of documents that Cara Woods had been dead for 40 plus years
6  when the quitclaim was signed. And even though there was
7  some argument later that, well, maybe it was somebody else,
8  like the son or whatever, it appears to be, again, some type
9  of cut and paste type job with an identical signature that
10  had been from another document. So, another example of what
11  appears to be a forged document of some type connected to Mr.
12  Walker and REO.

13         There's another document that I put less
14  credence in, simply because I can't figure out for sure what
15  might have happened. There's an argument that the Alan
16  Booker related transactions at Exhibits 47, 48 and 49 involve
17  similar types of fraudulent conduct.

18         It may well be true. There's a good
19  argument; I understand the argument but I don't think that
20  the evidence is clear enough to base any decision on, on that
21  particular transaction.

22         But at least as to the other three it
23  appears to be fairly much undisputed that there was
24  fraudulent activity connected to Mr. Walker and REO,
25  connected in the sense that it was done for the ultimate

1  benefit of Mr. Walker and REO. Whether it was done at the
2  behest of Mr. Walker and REO it's hard to tell. Whether it
3  was done, whether it was instigated by them there's no clear
4  evidence. But we do know that the Debtors were directly
5  connected, through the use of forged documents, to some very
6  fraudulent activity.
7         There's a second area that goes to the
8  heart of the whole argument about dishonesty that still
9  relates to some of these same documents but is a slightly
10 different angle on it, and that has to do with the state
11 statute that allows copies to be filed by attorneys if they
12 make an appropriate authentication and sign the proper
13 documents that, basically, state that they have possession of
14 the original. It's not unlike other types of electronic
15 processes, even the process we use in this court for
16 electronic court filing where debtors, for example, can sign
17 a petition and show that it's an electronic signature as long
18 as the attorney has possession of the signature. It's a very
19 practical method of dealing with it but it depends on the
20 honesty of the attorney to follow the rules.
21        It appears that Mr. Walker played fast
22 and loose with those rules. It's not absolutely conclusive
23 in every situation but at least in the one involving the
24 document notarized by Ms. Weaver, I can't come up with any
25 explanation that doesn't involve some type of either

1    dishonesty or absolute total disregard for the statute,

2    simply because it's the type of document that, on its face,

3    obviously is an embossed document.  He couldn't have had the

4    original, based on the testimony of Ms. Weaver.  It had to

5    have been some type of copy, as opposed to the original, and

6    yet he said he had the original.

7                    Is it possible that all of this is some

8    big coincidence?  Is it possible that Mr. Walker is the

9    victim of some extraordinary mistakes by others on his

10   behalf?  Sure, it's conceivable.  But what do I have in

11   explanation?  Absolutely nothing.

12                   Once there was clear proof that fraud was

13   involved, I would have anticipated some evidence to indicate

14   why there is a logical explanation.  And it's particularly

15   troubling because of the very nature of a debtor in

16   possession.

17                   I used to teach a paralegal course in

18   which one of my questions on an exam was, "What is a debtor

19   in possession?"  There was supposed to be this more

20   complicated answer but I remember one time the student said

21   it's a self-trustee.  I gave her credit for it because it was

22   a pretty good answer.  That's the nature of a debtor in

23   possession, in a position of trust.

24                   So, what do I have when there's

25   clear evidence that this particular person, Mr. Walker,

1  who both in his own business hand, REO, is responsible for a

2  significant amount of assets, what do I have when there's

3  clear evidence that he's either been engaged in, connected

4  to, or failed to recognize clear fraud going on relating to

5  his business?  What do I have?  Well, what I'd like to have

6  would be somebody that comes in and says, "Trust me," because

7  this is a position of trust, to be a debtor in possession.

8              I'd like to have somebody that says,

9  "Here is the reason you can trust me, despite the clear

10 evidence that there is a problem."  But what do I have?

11 Nothing, absolutely nothing.  All I have is, basically, an

12 argument that somehow all these pieces of evidence aren't

13 quite enough to pass muster to prove fraud.

14             And even if I might otherwise think that,

15 well, maybe I should give the Debtor the benefit of the

16 doubt, maybe it's just some big coincidence, maybe there's

17 some explanation, even though nobody gave it to me, the one

18 thing that provides the other significant evidence of

19 dishonesty that the Court cannot ignore is that, after being

20 accused of dishonesty in state court, after being alleged to

21 have committed all kinds of dishonest activity and having a

22 state court make preliminary findings of that, what's the

23 first thing the Debtor does?  What is the first thing Mr.

24 Walker does in coming into Bankruptcy Court?  He lies on his

25 Petition.  He says he has lived more than the majority of the

44

1   time, for the last 180 days, in Humboldt, Tennessee, which
2   is, based on the evidence, an absolute lie.
3           So, if there were any doubt about the
4   question of whether this Court should accept the implicit
5   request to trust me, by Mr. Walker, that would be the thing
6   that would put me over the edge, to say that these other
7   things can't just be pure coincidences.  This seems to be
8   some type of inherent underlying problem relating to honesty
9   of the Debtor.
10          Now, if we look back at the language in
11  the statute, I don't have to make a determination as to
12  whether Mr. Walker and REO, acting through him, are
13  dishonest.  All I need to find is that there is dishonesty,
14  incompetence, or gross mismanagement.
15          One of two things had to occur with
16  regard to all of these things.  That is, using forged
17  documents, authenticating documents where there's not
18  originals, signing a Petition saying you live in another
19  place where you don't live.  Either it's evidence of
20  dishonesty or it's such an extraordinary inattention to
21  detail and/or incompetence or mismanagement or something,
22  that I don't know how I could feel comfortable leaving him in
23  charge of a debtor in possession.
24          So, even giving the most positive spin
25  on it that you could possibly put, it's still some type

1  of state of being oblivious to the important details.  And

2  that would be enough in this type of case to justify

3  appointment of a trustee.  And I say that because I don't

4  think it's necessary, for purposes of the hearing today, to

5  make any kind of determination, and I make this quite clear,

6  any kind of determination as to specific fraudulent intent or

7  specific participation in fraud, or anything of that nature,

8  because it's not necessary to appoint a trustee.  It's only

9  necessary to find cause, and I find that there is cause,

10  based upon the evidence that demonstrates that there is

11  either a level of dishonesty that does not justify leaving

12  these two cases going forward without a trustee, or there's a

13  level of other cause, whether you call it incompetence,

14  mismanagement, failure to pay attention to details that are

15  critical to the business or whatever, it's still sufficient

16  to indicate that this is not a person that needs to remain in

17  control.

18                    One other thing that I need to address,

19  the U.S. Trustee has argued very forcefully that the standard

20  of proof in this type of case should be a preponderance of

21  the evidence rather than clear and convincing evidence.  The

22  courts are a little bit split on that and there's a

23  difference of opinion about whether some of the older cases

24  have effectively been superseded by some things that have

25  happened by statute and otherwise.

1          Much to the chagrin, I'm sure, of Ms.

2    Derrick, I'm going to conclude that it is not actually

3    necessary for me to make a concrete ruling on that.  I will

4    say, by way of dicta, and acknowledge that that is all it is,

5    that I tend to believe that preponderance of the evidence is

6    sufficient, simply because, in reviewing all the cases and

7    looking at the structure of the statute, and particularly the

8    way other statutory provisions are worded, that Congress

9    seems quite competent to use the term "clear and convincing"

10   when it's needed, and there are several instances under the

11   Bankruptcy Code that specifically require a higher standard.

12   Since that's not in Section 1104, I tend to think that clear

13   and convincing evidence may not be necessary and a

14   preponderance of the evidence may be sufficient.

15         But I find, for purposes of this hearing

16   today, that the evidence is clear and convincing, sufficient

17   to fit the standards under 1104, and for all the reasons that

18   I've explained, I think that we have significant undisputed

19   testimony that gives rise to serious, very serious questions

20   about either the honesty or the abilities of the people in

21   control of REO, and Mr. Walker himself, sufficient that it

22   meets the test of clear and convincing evidence, so that

23   under either standard, either a preponderance of the evidence

24   or clear and convincing, a trustee should be appointed in

25   each of these cases.

Case 3:16-bk-03304   Doc 324   Filed 10/19/16   Entered 10/19/16 08:46:57   Desc Main
                    Document     Page 47 of 50

1      So, I will reserve for another day, when

2 I really have to make that finding, a determination of which

3 one I would adopt as a matter of law. But since I find that

4 either standard has been met in this particular case, I don't

5 think a concrete ruling on that issue is necessary.

6      So, I'm going to grant the motions to

7 appoint a trustee in each of these cases and ask Ms. Derrick

8 to coordinate an appropriate order to be submitted. I'm

9 going to express no opinion, not that it's really been asked

10 for, about who the trustee would be, the type of trustee,

11 which it should be one or two, except I will say one more

12 thing that's somewhat related to that, that I failed to

13 mention. The other strong grounds that I didn't specifically

14 cover but I want to be sure it's in the record, is that the

15 conflict of interest between REO and Mr. Walker in and of

16 itself would arguably justify the appointment of a trustee.

17      We have, basically, very serious

18 allegations that have been accepted by a state court already

19 about actions that someone has taken, either with Mr.

20 Walker's permission, with his approval, or behind his back,

21 that relate to fraudulent activity on behalf of REO. And I

22 don't know what kind of litigation might arise out of that,

23 specifically, in terms of claims by REO against Mr. Walker or

24 claims of Mr. Walker against REO, or anything else, but

25 there's already litigation going on in state court where

48

1  that conflict could arise.

2          Mr. Strahn has already recognized the

3  conflict to the point of putting it in a statement about

4  withdrawal of counsel.  Clearly, there is potential

5  litigation that could arise in the Bankruptcy setting over

6  all of this, and it is, even if Mr. Walker were the most

7  honest person in the world, it is not realistic to,

8  basically, direct litigation strategy when you're essentially

9  determining whether to sue yourself or defend yourself or sue

10 others close to you or in related to entities.  It's a

11 totally untenable situation, and even if I didn't have the

12 concerns that I've raised about the honesty or the level of

13 attention to the business or the allowance of this kind of

14 fraudulent conduct under the supervision of Mr. Walker, even

15 without all of that, the conflict of interest, in and of

16 itself, would be sufficient to strongly consider appointment

17 of a trustee in at least one of the cases.

18          So, I think that covers everything I need

19 to cover.  Does anyone have any question about what I've

20 ruled or the basis for the ruling, or anything that needs to

21 be addressed in conjunction with that ruling?

22          MR. ***:  The Moveants have no questions

23 or comments, Your Honor.

24          THE COURT:  All right, if there's nothing

25 else then we'll be adjourned.

1             TRANSCRIPTIONIST'S CERTIFICATE

2

3             I, Ann Woofter, Court-approved transcriber,

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter.

7

8

9 _____    _____

10 Signature of Approved Transcriber        Date

11

12 Ann Woofter, Court Approved Transcriber

13